**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION**

**HOWARD M. JOHNS,**

              **Plaintiff,**

**-vs-**                                    **Case No. 6:06-CV-835-ORL-KRS**

**COMMISSIONER OF SOCIAL SECURITY,**

              **Defendant.**

**_____**

# ORDER

This cause came on for consideration without oral argument on the Complaint filed by Howard M. Johns, seeking review of the final decision of the Commissioner of Social Security denying his claim for social security benefits.  Doc. No. 1.  The Commissioner answered the Complaint and filed a certified copy of the record before the Social Security Administration (SSA).  Doc. No. 7.  Pursuant to the consent of the parties, this matter has been referred to me for disposition under 28 U.S.C. § 636(c). Doc. Nos. 9, 10.

**I.      PROCEDURAL  HISTORY.**

Johns applied for disability benefits under the Federal Old Age, Survivors and Disability Insurance Programs (OASDI), 42 U.S.C. § 401 _et seq._,and under the Supplemental Security Income for the Aged, Blind and Disabled Program (SSI), 42 U.S.C. § 1381, _et seq._, (sometimes referred to herein as the Act).  R. 65-67, 318-320A.

He alleged that he became disabled on September 1, 2001. *Id.* Johns's applications

were denied initially and on reconsideration. R.  26-30, 35-36, 321-25, 327-28.

Johns made a timely request for a hearing before an administrative law judge

(ALJ). R. 37.  An ALJ held a hearing on March 31, 2005.  Johns, represented by an

attorney, testified at the hearing.  Cynthia Patterson, a vocational expert (VE), also

testified.  R. 332-85.  The ALJ denied the request by Johns's counsel to call Johns's wife

as a witness at the hearing.  R. 381-82.

After considering the testimony and the medical evidence presented, the ALJ

determined that Johns was insured under OASDI through June 30, 2005.  R. 18. The

ALJ found that Johns had not engaged in substantial gainful activity since the alleged

onset date of his disability.  *Id.*

The ALJ concluded that the medical evidence showed that Johns had a history of

depression, a history of a seizure disorder and a history of elevated lipids, which were

severe impairments.  These impairments did not meet or equal any of the impairments

listed in the applicable social security regulations (the Listings).[1]  R. 19.

The ALJ found that Johns had the residual functional capacity (RFC) to perform a

reduced range of  light work,[2] as follows: he is "able to lift and/or carry up to 20 pounds

_____

[1]  The Code of Federal Regulations "contains a Listing of Impairments . . .
specifying almost every sort of medical problem ('impairment') from which a person can
suffer, sorted into general categories."  *Shinn ex rel. Shinn v. Comm'r of Soc. Sec.*, 391
F.3d 1276, 1278 (11th Cir. 2004); 20 C.F.R. Part 404, Subpt. P, App. 1.

[2]  Light work involves "lifting no more than 20 pounds at a time with frequent lifting
or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be

occasionally and 10 pounds or less more frequently.  He can stand for 6 hours in an 8

hour day, sit for at least 2 hours and is capable of pushing and pulling within the weight

noted. . . .  [He] must avoid hazards, including work around dangerous moving

machinery, unprotected heights, driving and climbing.  He is capable of performing

simple one to two step job tasks and cannot be subject to meeting any production

quotas."  R. 22.  The mental functional capacity limitations arose from the ALJ's finding

that Johns would have moderate problems with attention and concentration but

otherwise only mild restrictions in mental functional capacity.  R. 21.

In reaching this conclusion, the ALJ gave little weight to the functional capacity

assessments prepared by Dr. Corak and Dr. Benezette, both of whom were Johns's

treating physicians.  He found that Dr. Corak's assessment was inconsistent with his

progress notes.  R. 20-21.   He found that Dr. Benezette's opinion was based on

materially false and incomplete information that Johns had given him.  R. 20.  The ALJ

also found that Johns's testimony about the limitations arising from his impairments was

not totally credible, based on conflicting statements he had made during treatment and

at the ALJ's hearing, among other things. R. 19, 22.

Because Johns's past relevant work required more than a light level of exertion,

the ALJ concluded that Johns could not return to his past relevant work.  R. 22.  Relying

on the testimony of the VE, and considering the Medical-Vocational Guidelines (the

---

very little, a job is in this category when it requires a good deal of walking or standing, or
when it involves sitting most of the time with some pushing and pulling of arm or leg
controls."  20 C.F.R. § 404.1567, 20 C.F.R. § 416.967.

Grids), 20 C.F.R. Pt. 404, Subpt P, App. 2, the ALJ concluded that Johns could work in

light or sedentary unskilled jobs identified by the VE that were available in the national

economy.  R. 23.  Therefore, the ALJ concluded that Johns was not disabled.  R. 24.

Johns requested review of the ALJ's decision. R. 9.  On April 19, 2006, the

Appeals Council issued a decision finding no basis to review the ALJ's decision.  R. 5-7.

Johns timely sought review of this decision by this Court.  Doc. No. 1.

## II.      JURISDICTION.

The ALJ's decision became the final decision of the Commissioner when the

Appeals Council denied Johns's request for review.  *See Falge v. Apfel*, 150 F.3d 1320,

1322 (11th Cir. 1998); 20 C.F.R. §§ 404.981, 416.1481.  Therefore, the Court has

jurisdiction pursuant to 42 U.S.C. § 405(g), as adopted by reference in 42 U.S.C. §

1383(c)(3).

## III.     STATEMENT OF FACTS.

*A.     Evidence from Johns and His Family.*

Johns was born on July 19, 1955. He obtained a GED degree.  He had a

certificate of completion of a course of study in electronics.  R. 336.

Johns previously worked as a truck driver, line cook and cable television installer.

R. 337-41.  The ALJ noted that Johns had a poor earnings record.  R. 337, 341-42; *see

also* R. 68-69.  Johns explained that he had tried to start his own hauling company from

1997 through 2001.  R. 342; *see also* R. 72.

Johns was first diagnosed with a seizure disorder in 1984.  He had stopped

working as of September 1, 2001, because his seizures had returned despite taking

Dilantin and Tegretol.  R. 342-43, 346-47; *see* R. 219-20 (fact sheets for Dilantin and Tegretol). Johns testified that since September 2001, he had been having one or two seizures a month.  R. 345, 353.   When he had a seizure he lost consciousness; others told him that his whole body would shake for ten to fifteen minutes.  R.  353-55.  Sometimes he would lose bowel and bladder control. After a seizure, he remained disoriented for a couple of days.  R. 355.  He also had headaches and dizziness that he associated with the seizures and medication.  R. 355-57.  He had never sought emergency room treatment for a seizure.  R. 354.

Johns's mother wrote in March 2003, that Johns had had his last seizure in February 2003.  It had lasted for ten to fifteen minutes.  She indicated that Johns assumed a trance-like state with disorientation, and would fall down if not caught.  He remained unresponsive, sometime lost control of bodily functions, and usually pulled his left shoulder out of the shoulder joint. These seizures occurred mostly when Johns was alone at night.  She also wrote that Johns had a loss of memory, tired easily and could not drive.  R. 84-85.  In a subsequent written report, however, Johns's mother wrote that she had not seen many seizures since 1984-1985 because she no longer lived with Johns.  R. 110.

Johns also complained of shortness of breath, but he was still smoking cigarettes.  R. 348-49.  He was taking medication for his breathing problems.  R. 350.

Johns had pain in his left arm due to dislocating his shoulder during a seizure.  R. 71, 356.  In written reports, Johns indicated that he had a weak back.  R. 71.  He also took medication for a heart-related problem.  R. 369.

Johns testified that he had no problem with walking, standing or sitting.  R. 358.

His memory and ability to concentrate were poor.  R. 346, 359.

Johns lived with his wife and son.  R. 362.  He was able to do microwave cooking,

and he washed the dishes, did the laundry and vacuumed.  R. 363-64.  His wife did the

other household chores.  R. 104-05.  During the day he would talk to his dogs and visit

his mother.  R. 365.   Johns did not drive.  R. 337.

After the vocational expert testified, Johns's attorney asked to call Johns's wife as

a witness.  The ALJ denied the request because it was not made before the VE testified.

R. 381-82.

B.    *Vocational Expert Testimony.*

The ALJ posed the following hypothetical question to the VE:

> Assume . . . the claimant[ ] is currently a younger person
> under the age 50 with a GED education, with additional
> training in electronics field.  Assume I find regarding the
> portion of an eight hour work day, the claimant can . . .
> [s]tand, walk for a period of at least six hours.  Sit two hours.
> Claimant has occasional ability to lift maybe 10 pounds less
> on a frequent basis.  He can frequently either stoop, bend,
> crouch or crawl, kneel.  And no fine work in proximity with any
> moving machinery or unprotected heights.  No riding
> automobiles or types of assembly with that.  And these are
> related to the performance of simple rote, repetitive one and
> two step job tasks and some significant as for part of this.
> The job shouldn't involve climbing, not involve both, such as
> jobs as assembler.

R. 374.  The VE opined that this hypothetical claimant could not perform Johns's past

relevant work.  However, this claimant could perform the following jobs: food and

beverage clerk – sedentary work (SVP 2[3]); addresser – sedentary, unskilled work (SVP

2); cleaner – light work (SVP 2); mail clerk – light, unskilled work (SVP 2); and sorter –

light, unskilled work (SVP 2).  Each of these jobs was available in significant numbers in

the local and national economy.  R. 375.

> The ALJ then asked the VE to assume the following additional limitations:

> > Assume further that the claimant may have random seizures .
> > . . [which] may occur sometimes at the job setting, and
> > sometimes not.  But maybe twice a month the claimant would
> > have a seizure which lasts a few minutes, perhaps five
> > minutes or a little longer.  Then after the seizure is over he
> > requires a brief recuperative period of 15 minutes.

R. 376.  The VE opined that the hypothetical claimant could perform the previously

identified jobs even with these additional limitations.  R. 376.  Finally, the ALJ asked the

VE to assume that the claimant would need to lie down three hours a day once a month.

R. 380-81.  The VE responded that the claimant could perform the previously identified

work with this additional limitation.  R. 381.

> Johns's attorney then attempted to ask the VE whether additional limitations, such

as the claimant losing consciousness, walking with an unsteady gait, and needing

sheltered employment, would erode the occupational base for available work.  The ALJ

did not permit these questions.  R. 376-81.

---

[3]  "The [*Dictionary of Occupational Titles (DOT)*] . . . lists a specific vocational
preparation (SVP) time for each described occupation.  Using the skill level definitions in
[the regulations], unskilled work corresponds to an SVP of 1-2; semi-skilled work
corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the
DOT."  Soc. Sec. Rul. 00-4p, 2000 WL 1898704, at *3.

C.    *Medical Records.*

Johns was treated at the Volusia County Health Department from 1985 through 2005.  R. 198-249, 258-267A (Exhibits 9F and 12F).[4]

The medical records reflect that John R. McCormick, M.D., treated Johns for a seizure disorder beginning at least by 1985.  R. 246-48.  Dr. McCormick noted in May 1985, that Johns dislocated his left shoulder during a seizure.  Dr. McCormick treated Johns with Tegretol and Dilantin.  R. 248.  On August 29, 1985, Johns reported that he had no further problems with seizures.  R. 247.  Johns reported feeling tired during an examination in May 1986.  He indicated in November 1986 that he was still having no problems with seizures.  R. 246.

Hendrik Dinkla, M.D. began treating Johns at least by 1990.  In November 1990, Johns reported that he had not had seizures since 1985.  He was still taking medication, and was able to drive.  R. 245.  Dr. Dinkla's 1991 examination reports reflect that Johns was still seizure-free.  R. 243-44.

On April 29, 1994, Johns told Dr. McCormick that he had had a seizure the previous weekend despite taking his medication.  Dr. McCormick noted on physical examination that Johns had a decreased range of motion in his back.  R. 241.

On September 23, 1994, Johns was treated by Carrie Landess, M.D., for complaints of chest pain.  Johns reported that he had not had a seizure since April.  R. 240.  Testing revealed cardiac arrhythmia.  R. 239.

---

[4] These exhibits include treatment records from Drs. McCormick, Corak, Dinkla, and Landess.  It is not clear whether these doctors worked at the clinic or were professionals to whom Johns had been referred by the clinic.

Johns continued to report that he had not had seizures through October 2002.  R. 221-26, 230-38.  Blood tests from July 2001 through 2005 confirm that Johns was taking Dilantin and Tegretol for epilepsy.  R. 182-90, 193, 196-97, 273, 286, 288.  In October 2002, Johns complained of headaches.  R. 221.  In November, Johns had two or three seizures with blackouts.  R. 221.

Johns advised David S. Thompson, M.D., on December 6, 2002, about the seizures in November 2002.  He indicated that he had three or four other episodes in the previous six month.  Nevertheless, he continued to drive.  He also complained of headaches.  After examination, Dr. Thompson's impression was that Johns suffered from a partial complex seizure disorder with secondary generalization, poorly controlled.  He scheduled a CT scan and adjusted Johns's medication.  R. 216.  The CT scan was essentially normal.  R. 215.

In January 2003, Johns told Dr. Corak that he had not had seizures since Dr. Thompson adjusted his medication.  R. 215.  Dr. Corak asked Johns to keep a record of seizures on a calendar.  R. 215.

In follow-up examinations, Johns reported no seizures, but he complained of headaches, trouble breathing and difficulty remembering things.  R. 211-14, 271.   In July 2003, Johns indicated that he thought he had had a seizure sometime since his last visit.  R. 211.  He reported in August 2003, that he had had a seizure three days before.  R. 208.

In September 2003, Brad Warrick, M.D., evaluated Johns at the request of the SSA.  Johns reported suffering from seizures, back and shoulder pain, chest pain, fatigue and memory loss.  R. 151.  Johns's physical examination was normal.  He had a

flat affect, but he was able to follow simple directions.  R. 152-54.  Dr. Warrick noted that Johns's back pain was controlled with chiropractic manipulations.  He advised Johns to avoid arm positions that would exacerbate his shoulder pain.  Dr. Warrick opined that Johns was severely depressed, and that his memory loss was secondary to depression and likely sleep apnea.  R. 154.

Steven K. Abraham, Psy.D., and David M. Zelbovitz, Psy.D., examined Johns on September 3, 2003, at the request of the SSA.  At that time, Johns reported that he had two to three seizures every month.  He had memory problems, was depressed and had difficulty concentrating.  He was taking a variety of medications.  R. 148.  He scored poorly on a mental status test.  R. 149-50.  The diagnoses were as follows: major depression, recurrent, moderate severity; and cognitive disorder not otherwise specified.  The psychologists rated Johns's global assessment of functioning (GAF) score at 50.[5]  They opined that "the physical and psychological challenges faced by [Johns] are significant enough to make withstanding the pressures of a work environment quite difficult."  R. 150.

As of January 2004, Johns reported continuing seizures that appeared to be of a grand mal type to the treating physician.  He also complained of difficulty breathing.  R. 205.  Blood tests showed that his medication was on the lower side of the therapeutic range.  R. 205.  Medication was adjusted.  R. 203.  While he missed a doctor's

---

[5] The Global Assessment of Functioning ("GAF") scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, or unable to care for himself).  *Harold I. Kaplan, M.D. & Benjamin J. Sadock, M.D., Synopsis of Psychiatry* 299 (8th ed. 1998) (hereinafter *Synopsis of Psychiatry*).  A GAF rating of 41-50 reflects "Serious symptoms (eg, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (eg, no friends, unable to keep a job).  *Id.*

appointment in February 2004, it appears that he was subsequently seen and his medications were refilled.  R. 200-03.

Johns was examined by Alyn Benezette, D.O., a neurologist, on February 23, 2004.  Johns reported a seizure disorder for which he had been treated by Dr. McCormick at the Volusia County Health Department.  R. 265-66.  Johns indicated that he had no warning of an oncoming seizure. During the seizure, he would lose consciousness with muscle spasms (tonoclonic activity) of the extremities, tongue biting and incontinence of bowel and bladder.  He reported at least two seizures a month despite compliance with medication, with the last seizure a week before.  He had problems with concentration, attention, memory and balance.  He was no longer driving. R. 265.  He also complained of headaches, episodic blurred vision, shortness of breath and chest pain.  R. 266.

Upon examination, Dr. Benezette noted that Johns's thought processes were slow and he was somewhat incoherent at times.  R. 267.  He found some restriction of motion in Johns's left shoulder (glenohumeral joint), and clubbing of his fingers.  R. 266.  He had mild dysmetria[6] when touching his finger to his nose, his reflexes were diminished, and he walked with a slightly wide-based gait with a positive Romberg sign.[7]  Dr. Benezette's impression was that Johns suffered from generalized tonoclonic epilepsy secondary with disequilibrium and encephalopathy (a brain disorder).    He directed Johns to remain on

---

[6] Dysmetria is "[u]sually used to describe abnormalities of movement caused by cerebellar disorders."  *Stedman's Medical Dictionary* 533 (26th ed. 1995)(hereinafter *Stedman's*).

[7] The Romberg test reveals whether the patient has difficulty balancing.  *See Movement – uncoordinated*, Medline Plus Medical Encyclopedia, http://www.nlm.nih.gov/ medlineplus/ency/article/003198.htm (last visited Sept. 25, 2007).

his medication, and not to operate a motor vehicle.  He prescribed additional medication, and recommended that Johns have balance testing.  R. 267.

In March 2004, Johns told Dr. Benezette that he had had three seizures that month.  Dr. Benezette noted that he had received records from Dr. Corak.  Upon examination, Dr. Benezette observed that Johns's thought processes were slow and his affect was flat. He continued to have diminished reflexes, mild dysmetria, a slightly wide-based gait, and a positive Romberg sign.   R. 261-62.  Dr. Benezette's impressions remained the same.  R. 262.

Dr. Benezette examined Johns again in April 2004.  Johns reported that he had had two more seizures in April.  Blood work revealed that Johns was compliant with his medication.  His thought processes remained slow, and his affect flat.  He had mild dysmetria, diminished reflexes, and walked with a wide-based and mildly unstable gait. Dr. Benezette's impressions were the same.  He adjusted Johns's medication.  R. 259. Dr. Benezette wrote that Johns "remains unable to work with a poor prognosis of ever returning to any type of gainful employment."  R. 260; *accord* R. 258.

In May 2004, Johns told Dr. Corak that he had had three seizures in the previous year, despite taking his medication.  R. 270.  On November 18, 2004, Johns reported having three grand mal seizures monthly.  R. 269.  Johns also reported that he had a seizure Thanksgiving day 2004.  R. 298.

In November 2004, Dr. Benezette prepared RFC assessments.  He indicated that Johns suffered from the following:  generalized tonoclonic epilepsy; moderate short term memory loss; diminished vision; injured left shoulder that dislocates; and a low back condition. R. 250.  Johns's then current symptoms were as follows: "imbalance,

dizziness; poor coordination; unsteady gait; slow thought process; impaired cognitive ability; biting of tongue; bow[e]l and bladder incont[i]nence; occasionally falls to ground." R. 250.  Dr. Benezette wrote that Johns had episodes of dizziness three or more times per month, each episode lasting one minute but post-episode recovery taking several hours.  R. 254.  Dr. Benezette's clinical findings included that Johns had a wide-based gait, positive Romberg sign with some restriction of motion in the left shoulder, with clubbing of his fingers.  R. 250.  These conditions had begun years previously. R. 253A; *see also* R. 250 (indicating that the condition had lasted or could be expected to last twelve months or more).

Dr. Benezette indicated that Johns was not a malingerer, but that emotional factors contributed to his functional limitations.  He opined that Johns had depression that would frequently interfere with his attention and concentration.  As a result, he was incapable of performing even low stress jobs.  R. 251; *see also* R. 256.

With respect to Johns's physical and postural functional limitations, Dr. Benezette indicated that Johns could sit for one hour at a time, stand for forty-five minutes at a time, and sit, stand or walk a total of about four hours in a work day.  Johns would need to alternate sitting, standing and walking.  R. 251-52.  Johns could lift up to ten pounds occasionally.  He  would need to take unscheduled breaks during the day and might need to lie down occasionally.  R. 252, 253A.  He could never climb ladders, work at heights or operate power machines, could rarely climb stairs, and could only occasionally twist, stoop (bend), crouch and squat.  R.  253-55.  He should not operate a motor vehicle.  R. 250, 255, 256.  Dr. Benezette opined that Johns would have good days and bad days, and that Johns would likely miss four days or more of work per month.  R. 253, 256.  He

would need more supervision than an unimpaired worker.  R. 255.

A pulmonary functional capacity test performed in December 2004, reflected that Johns had severe obstructive dysfunction that was mildly improved after use of a bronchodilator.  R. 280.

In May 2005, Dr. Corak completed an RFC questionnaire.  He indicated that he had treated Johns two to three times a year since 1984 for a seizure disorder.  He indicated that the seizures were generalized with loss of consciousness, and occurred two to three times a month, with the last seizure occurring on November 11, 2004.  R. 303.  For one to two hours after a seizure, Johns was confused, exhausted, irritable and had a severe headache.  Johns was compliant with taking medication.  R. 304. Dr. Corak opined that Johns was unable to work.  R. 304A.

     *D.*    *Reviewing Professionals.*

          1.    <u>Physical RFC Assessments</u>.

In April 2003, Murthy Ravipati, M.D., rendered a RFC assessment after reviewing Johns's records.  Dr. Ravipati opined that Johns could lift twenty pounds occasionally and ten pounds frequently.  He could sit, stand or walk about six hours in an eight-hour work day.  He could only occasionally balance, and he should avoid even moderate exposure to hazards such as machinery and heights.  R. 135-42.

In September 2003, David Z. Kitay, M.D., prepared a physical RFC assessment after reviewing Johns's records.  Dr. Kitay's exertional capacity assessment was the same as Dr. Ravipati's assessment.  R. 156-63.  With respect to nonexertional limitations, Dr. Kitay opined that Johns should never climb ladders, ropes or scaffolds,

and that he could only occasionally balance.  R. 158.  He found no other nonexertional

limitations.

2.      Mental RFC Assessments.

In September 2003, Deborah Carter, Ph.D., prepared mental RFC assessments

after review of Johns's records.  R. 164-81.  Dr. Carter opined that Johns would have

moderate limitations in activities of daily living and in maintaining concentration,

persistence or pace, and only mild limitations in social functioning, with no episodes of

decompensation.  R. 178.  She indicated that Johns would be moderately limited in the

following abilities:  to understand, remember and carry out detailed instructions; maintain

attention and concentration for extended periods; perform activities within a schedule,

maintain regular attendance and be punctual within customary tolerances; complete a

normal workday and workweek without interruptions from psychologically based

symptoms and to perform at a consistent pace without an unreasonable number and

length of rest period; and travel in unfamiliar places or use public transportation. R. 164-

65.

## IV.    STANDARD OF REVIEW.

To be entitled to disability benefits under OASDI or SSI, a claimant must be

unable to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which has lasted or can be expected to last

for a continuous period of not less than twelve months.  42 U.S.C. § 423(d)(1)(A); 42

U.S.C. § 1382c(a)(3)(A).  A "physical or mental impairment" under the terms of the Act is

one "that results from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42

U.S.C. § 423(d)(3); 42 U.S.C. § 1382c(a)(3)(D).   In a case seeking disability benefits under OASDI, the claimant also must show that he or she became disabled before his or her insured status expired in order to be entitled to disability benefits.  42 U.S.C. § 423(c)(1); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979).

Pursuant to 42 U.S.C. § 405(a), the SSA has promulgated a five-step inquiry that must be followed in determining whether a claimant is entitled to benefits.  In sum, an ALJ must apply the following criteria, in sequence:

> (1) Is the claimant presently unemployed?

> (2) Is the claimant's impairment severe?

> (3) Does the claimant's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1?

> (4) Is the claimant unable to perform his or her former occupation?

> (5) Is the claimant unable to perform any other work within the economy?

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  An affirmative answer to any of the above questions leads to either the next question, or, on steps three and five, to a finding of disability.  A negative answer leads to a finding of "not disabled."  *See, e.g.*, *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1987).

"The burden is primarily on the claimant to prove that he is disabled, and therefore entitled to receive Social Security disability benefits."  *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001) (citing 20 C.F.R. § 404.1512(a)).  However, "the burden temporarily shifts at step five to the Commissioner[,] . . . [who] must produce evidence that there is other work available in significant numbers in the national economy that the claimant has

the capacity to perform." *Id*. at 1278 n.2 (citing *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999)).

A court's review of a final decision by the SSA is limited to determining whether the ALJ's factual findings are supported by substantial evidence, *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005), and whether the ALJ applied the correct legal standards, *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988).

The SSA's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *Dyer*, 395 F.3d at 1210.  "Substantial evidence is more than a scintilla, and must do more than create a suspicion of the existence of the fact to be established.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Walden v. Schweiker*, 672 F.2d 835, 838-39 (11th Cir. 1982)(internal quotations omitted).

The court "must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [SSA's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Where the SSA's decision is supported by substantial evidence, the court will affirm, even if the court finds that the proof preponderates against the decision.  *Dyer*, 395 F.3d at 1210.  The court may not reweigh the evidence or substitute its own judgment.  *Id*.

While there is a presumption in favor of the SSA's findings of fact, no such presumption attaches to the ALJ's legal conclusion about the proper standards to be applied in evaluating claims.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988).  Therefore, the court will reverse if the SSA incorrectly applied the law, or if the decision fails to provide the court with sufficient reasoning to determine that the SSA properly

applied the law. *Keeton v. Dep't of Health & Human Serv's*, 21 F.3d 1064, 1066 (11th Cir. 1994) (citing *Cornelius v. Sullivan*, 936 F.2d 1143, 1146 (11th Cir. 1991)).

When reviewing a final decision issued by the SSA, the court is authorized to "enter . . . a judgment affirming, modifying, or reversing the decision . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## V.    ANALYSIS.

Johns asserts that the ALJ erred by failing to give great weight to the functional capacity assessments of Drs. Corak and Benezette, both of whom were treating physicians. He also argues that the ALJ improperly impeded his attorney's efforts to more fully develop the record when he would not permit Johns's wife to testify and when he precluded the attorney from questioning the VE. He also contends that the ALJ erred in finding that he was not credible. Finally, he submits that his condition met or equaled listed impairments or, alternatively, that his mental impairments precluded him from performing a reduced range of light work. These are the only issues subject to review.[8]

*A.       Credibility and Right to Call Corroborating Witness*.

The ALJ found that Johns's credibility was "in serious question" because he gave conflicting reports of his seizure activity to Drs. Benezette and Corak and at the hearing. The medical records reflect these inconsistencies.

Johns testified that he had had one or two seizures a month since September 2001. Yet, the medical records reflect that he was seizure-free from April 1994 until November 2002. The ALJ also correctly noted that Johns's reports of his seizure

---

[8] The parties were advised that issues not specifically raised would be waived. Doc. No. 8 at 2.

activities to his doctors were inconsistent.  For example, he reported seizures in July,

August, September 2003 and January, March (three seizures) and April (two seizures)

2004, but he told Dr. Corak in May 2004 that he had had only three seizures the previous

year.

Johns argues that this inconsistency is explained by his poor memory.

Additionally, because Johns loses consciousness during his seizures, it would be difficult

for him to report accurately when they occur.  He attempted to sustain his burden of

proving the extent of his seizure activity through the testimony of his wife.  The social

security regulations recognize that evidence from others who witnessed the seizures is

essential to evaluate the extent of Johns's seizure activity because no treating

professional had observed the seizures.  20 C.F.R. pt. 404, subpt. P, App. I, § 11.00

("Testimony of persons other than the claimant is essential for description of type and

frequency of seizures if professional observation is not available.").[9]  Accordingly, the

ALJ erred by precluding this relevant testimony.  *See Depaepe v. Richardson*, 464 F.2d

92 (5th Cir. 1972)(reversing ALJ's decision due to failure to weigh testimony of family

members who corroborated claimant's testimony regarding subjective symptoms).[10]

---

[9]  While the record contains statements from Johns's mother, his mother candidly admitted that she had not witnessed many seizures since Johns no longer lived with her. Under these circumstances, testimony from Johns's wife would have been illuminating regarding the extent of Johns's seizure activity.

[10]  The Commissioner argues that because Johns did not proffer the testimony his wife would have given, Johns failed to show that the exclusion of her testimony was prejudicial to him.  When, as here, the claimant tries to present the testimony but is precluded from doing so by the ALJ, the claimant has done all that is necessary to establish prejudice.

On remand, the ALJ should permit Johns to present evidence to sustain his burden of proof.  This includes evidence from family members and others who have observed his seizures.  It would also be prudent to permit Johns to question the VE regarding the extent that certain limitations would change the VE's opinion about the jobs Johns could perform.

B.      *Treating Physicians.*

The ALJ's decision also presents concerns regarding his failure to give great weight to the opinions of Drs. Benezette and Corak.  In this circuit, the opinion of a treating physician must be "must be given substantial or considerable weight unless 'good cause' is shown to the contrary." *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997) (citing 20 C.F.R. § 404.1527(d)(2)).  Good cause has been found "where the doctor[s'] opinion[s] [were] not bolstered by the evidence, . . . where the evidence supported a contrary finding[,] . . . [or] where the doctors' opinions were conclusory or inconsistent with their own medical records."  *Id.* (internal citations omitted).  While an ALJ may disregard a treating physician's opinion that a claimant is disabled or unable to work, *see* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1), the ALJ must articulate reasons for giving less weight to the functional capacity assessments of a treating physician. *Lewis*, 125 F.3d at 1440.

The ALJ cited only one treatment note to support his conclusion that Johns had been "very inconsistent with following his prescribed medical treatment as he failed to increase his Tegretol as instructed by Dr. Benezette . . . ."  R. 20.  He failed to provide pinpoint citations to the record to support his conclusion that "numerous serologic tests show the claimant's Dilantin and Tegretol levels to be sub-therapeutic." *Id.*  While there is

a treatment note reflecting that Dilantin and Tegretol levels were on the "lower side of [the] therapeutic range," R. 205, the ALJ did not cite to any opinion by a treating professional that Johns was not taking his medication as prescribed. In contrast, Dr. Corak wrote that Johns was compliant with taking his medication. R. 304.

The ALJ also found that "[t]he tone and tenor of Dr. Corak's rather abbreviated progress notes from November 1998 to November 2004 . . . show that the claimant has been relatively seizure free for much of this time frame." R. 21. While this conclusion is supported by the record based on treatment records through July 2003, it ignores the change in Johns's condition that is documented thereafter. In May 2004, Dr. Corak's treatment notes reflect that Johns reported having three seizures the previous month. R. 270. This is consistent with Dr. Benezette's records, in which Johns reported having two seizures in April 2004. R. 259. In November 2004, Dr. Corak's treatment note reflects that Johns reported having three grand mal seizures each month. R. 269. This is consistent with Dr. Benezette's dizziness RFC assessment prepared in November 2004, in which he indicated that Johns was having approximately three seizures per month. R. 254.

Accordingly, remand is also required to permit the Commissioner to accord great weight to the opinions of Drs. Corak and Benezette, or to state specific reasons supported by substantial evidence in the record if the opinions are not credited.

C.    *Listing of Impairments.*

Johns contends that the Court should conclude that his epilepsy met or equaled a listed impairment and remand the case for an award of benefits. Listing 11.02 requires evidence of the following:

> Epilepsy--convulsive epilepsy, (grand mal or psychomotor), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once a month in spite of at least 3 months of prescribed treatment.
>
> A. Daytime episodes (loss of consciousness and convulsive seizures) or
>
> B. Nocturnal episodes manifesting residuals which interfere significantly with activity during the day.

20 C.F.R. Pt. 404, subpt. P, App. I, § 11.02.  Listing 11.03 requires evidence of the following:

> Epilepsy--nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern, including all associated phenomena; occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment. With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

*Id.* § 11.03.

The record does not support Johns's contention that his condition met or equaled Listings 11.02 or 11.03 as of September 1, 2001, the alleged onset of his disability.  Until the record is more fully developed about the frequency of Johns's seizures and the associated phenomena, the record also is insufficient to find beyond doubt that he met Listings 11.02 or 11.03 at any time since September 1, 2001.  Under these circumstances, an award of benefits is not warranted.  *See Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).

## VI.    CONCLUSION.

For the reasons set forth herein, it is **ORDERED** that the decision of the Commissioner is **REVERSED** and the case is **REMANDED** under sentence four of 42 U.S.C. § 405(g) for further proceedings.  The Clerk of Court is directed to issue a judgment consistent with this Order and, thereafter, to close the file.

**DONE** and **ORDERED** this 25th day of September, 2007.

*Karla R. Spaulding*
KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE